IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ANDREA RENEA PEGG                                                                    PLAINTIFF

v.                                                              CIVIL ACTION NO. 1:23-CV-81-SA-RP

M1 SUPPORT SERVICES, LP;
IUE-CWA COMMUNICATION WORKERS OF AMERICA; and
IUE-CWA LOCAL 83770                                                               DEFENDANTS

ORDER AND MEMORANDUM OPINION

On May 23, 2023, Andrea Renea Pegg initiated this litigation by filing her Complaint [1]
against M1 Support Services, LP; IUE-CWA Communication Workers of America ("the
International Union"); and IUE-CWA Local 83700 ("the Local Union"). Her Second Amended
Complaint [96] is now the operative complaint. The Defendants have filed separate Motions for
Summary Judgment [122, 124, 126], which are now ripe for review. Having considered the parties'
filings, in addition to the applicable authorities, the Court is prepared to rule.

*Relevant Background*

Pegg worked as a scheduler at the Columbus Air Force Base in Columbus, Mississippi for
over 30 years before her eventual termination in August 2022. During her tenure at the Columbus
Air Force Base, Pegg worked for various federal contractors that were responsible for performing
repair and maintenance work on aircraft for the United States Armed Forces at the Columbus base.
At the time of her termination, Pegg was employed by M1 Support Services, which had taken over
the federal contract at the Columbus base in October 2019.

When she was terminated, Pegg was a member of the bargaining unit represented by the
Local Union, which is an affiliated local of the International Union. As pertinent here, M1 and the
Local Union entered into a Collective Bargaining Agreement ("CBA"), which was effective

beginning September 1, 2019, and governed the terms and conditions of employment for bargaining unit employees like Pegg.

When M1 took over the Columbus Air Force Base contract, Pegg held the position of Lead in the Plans and Scheduling ("P&S") Division. About six months later—on March 10, 2020— Johnny Smith, who held the position of Program Director, presented Pegg with a memorandum advising her that she was being demoted, effective immediately, from P&S Lead to P&S Scheduler. The memorandum notified Pegg that an anonymous complaint had been made against her via the company's ethics hotline. As stated in the memorandum, "[t]he primary concern contained in the complaint alleges that you use retaliation and intimidation to control and restrict work output in the Plans and Scheduling (P&S) section." [131], Ex. 5 at p. 1. The memorandum further explained that M1 had investigated the allegation and that it had been substantiated. Simultaneously with the memorandum, Pegg was presented a form to sign. She refused to sign it.

At Pegg's request, the Local Union filed a grievance on her behalf related to the demotion. She was promoted to a Senior Scheduler position on March 23, 2020—less than two weeks after the demotion.[1]

The following day, Pegg visited Dr. Slater Lowry at Lowry Medical Clinic to receive treatment for stress and anxiety. While at Dr. Lowry's office, Pegg received a phone call from Smith, at which time Smith advised her that she had been accused of stealing company records. Ultimately, Dr. Lowry placed Pegg on leave from work due to her stress and anxiety issues. Pegg was on medical leave for approximately one year.

After Pegg informed M1 that she had been released to return to work in March 2021, the company immediately placed her on administrative leave, pending an investigation into the

---

[1] While Pegg was promoted to a Senior Scheduler position, this was not the same P&S Lead position that she held prior to the March 10, 2020 demotion.

allegation that she had stolen company records a year earlier. She was eventually cleared and permitted to return to work on April 12, 2021.

When Pegg returned to work, Melanie Beard was her supervisor. To provide additional context, when Pegg was demoted from the P&S Lead position in March 2020, Beard was promoted to that position. In other words, Beard took Pegg's position when she was demoted.

Notably, Pegg testified that it was Beard who made the anonymous hotline complaint that led to her demotion and it was also Beard who claimed that she had stolen company records in March 2020. Pegg also testified that, upon her return to work, Beard would "constantly" make comments about her having been out on medical leave. [131], Ex. 2 at p. 103. In an affidavit, Pegg described Beard's treatment upon her return from her extended medical leave: "Beard was hostile to me after my return. She would assign me excessive work assignments. I was doing triple the amount of work any other scheduler was doing. She was constantly telling me that I had 'left her' when I went on medical leave, and this had caused her extra work. She complained about everything I did." [131], Ex. 4 at p. 2.

In April 2022, Pegg was the subject of a disciplinary action after she made an error resulting in an aircraft being grounded. Pegg's error involved incorrectly recording a serial number for the aircraft. As phrased by the International Union, "Pegg's negligence and carelessness led to a substantial safety of flight discrepancy which led to an aircraft flying fourteen (14) times when it should not have been in flight and should have been grounded." [123] at p. 4. Though she contends that other employees committed similar offenses and did not receive writeups, Pegg admits that she committed the underlying offense that led to this writeup. She was suspended three days without pay.

3

Pegg received a second writeup for workplace negligence about four months later in August 2022. This writeup stemmed from Pegg's alleged failure to properly address an issue related to a time compliance tech order ("TCTO") on an aircraft that was assigned to her.[2] In particular, a TCTO was issued relating to a seat egress inspection on an aircraft while the aircraft was located at Vance Air Force Base in Oklahoma. It is undisputed that Vance Air Force Base did not complete the TCTO. When the aircraft arrived at Columbus Air Force Base, it was, according to the Defendants, Pegg's responsibility to notice that the TCTO had not been completed. Pegg admits that she did not identify the uncompleted TCTO but disputes that it was her responsibility to do so. At some point thereafter, following the aircraft's departure from Columbus Air Force Base, the error was discovered. The aircraft was grounded as a result.

The pertinent disciplinary action documentation described Pegg's error as "[f]ailing to identify the TCTO IT-38C-588 was not completed on aircraft A8193 as required and assigned to you as the Senior Scheduler. This resulted in a safety of flight and the aircraft was grounded." [122], Ex. 6 at p. 1. Again, Pegg has consistently maintained that this issue was not her responsibility and that the second writeup was therefore not justified.

As a result of the August 2022 violation, M1 terminated Pegg's employment pursuant to the terms of the CBA. At Pegg's request, the Local Union filed a grievance "protest[ing] the reasoning, equality, and fairness outlined by the company." [96], Ex. 2 at p. 1. Consistent with the terms of the CBA, the grievance was moved to Disciplinary Step III and was discussed at a meeting at which personnel from M1 and the Local Union were present. That meeting was held on September 19, 2022. M1 ultimately denied the grievance related to her termination.

---

[2] A TCTO is an order issued by the United States Air Force that is dispersed via a computer system to each aircraft maintenance and repair contractor and outlines a particular required action as to a particular aircraft.

Via letter dated September 27, 2022, Jeff Andrews, the Chief Steward of the Local Union, advised M1 of the Local Union's intent to arbitrate Pegg's grievance pertaining to the March 2020 demotion, as well as her grievance regarding the termination. *See* [124], Ex. 12 at p. 1 ("Please accept this as the Union[']s intent to Arbitrate *both* grievances specifically Grievance 22-19 and Grievance 22-23.") (emphasis added). But neither grievance was taken to arbitration. Pegg contends that she continually requested information from Union officials regarding a potential arbitration but was never provided any information.

She eventually retained counsel, and this lawsuit followed. In her Second Amended Complaint [96], Pegg contends that M1 terminated her employment without just cause in violation of her rights under the CBA. She also alleges that the Local Union and International Union breached the duty of fair representation in failing to pursue arbitration of her grievances. In the present Motions [122, 124, 126], the Defendants separately seek summary judgment and raise various bases for dismissal.

*Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the

absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

In 1983, the Supreme Court held that "an individual employee may bring suit against [her] employer for breach of a collective bargaining agreement." *Hinton v. Teamsters Local Union No. 891*, 818 F. Supp. 939, 941 (N.D. Miss. 1993) (citing *DelCostello v. Teamsters*, 462 U.S. 151, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983)). The employee "likewise may bring suit against [her] union, for although an employee is ordinarily bound by the grievance and arbitration procedures, an exception is available when an employee can prove that the union representing him acted in a 'discriminatory, dishonest, arbitrary, or perfunctory fashion[.]'" *Id*. (quoting *DelCostello*, 462 U.S. at 164, 103 S. Ct. 2281). The popular term for such claims is a "hybrid § 301/fair representation" claim as it combines the two claims. *Id*. "The claim against the employer rests on § 301 of the Labor Management Relations Act, since the employee is alleging a breach of the collective bargaining agreement, while the claim against the union rests on a breach of the duty of fair

representation, which is implied under the National Labor Relations Act." *Id.* (citing *DelCostello*, 462 U.S. at 164, 103 S. Ct. 2281).

"Hybrid actions are composed of two elements: (1) an allegation that the employer breached the collective bargaining agreement; and (2) an allegation that the union breached its duty of fair representation." *Calvert v. Eljer Plumbingware, Inc.*, 2005 WL 1683780, at *4 (N.D. Miss. July 19, 2005) (citing *Gibson v. U.S. Postal Serv.*, 380 F.3d 886, 888 (5th Cir. 2004)). A hybrid action can be brought against the employer, the union, or both, but "[w]hich ever the case may be, both elements must be proven." *Id.* (citing *Gibson*, 380 F.3d at 888). But "a fair representation claim against the union is an indispensable predicate for lodging a section 301 claim against an employer." *Id.* (citing *Daigle v. Gulf States Utilities Co.*, 794 F.2d 974, 979 (5th Cir. 1986)). Consequently, prior to addressing whether the employer breached the collective bargaining agreement, the aggrieved employee must show that the union breached the duty of fair representation. *Id.* (citing *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S. Ct. 1559, 67 L. Ed. 2d 731 (1981)).

In their respective Motions for Summary Judgment [122, 124, 126], the Defendants contend that Pegg cannot establish a genuine issue of material fact as to the Unions' respective alleged violations of the duty of fair representation, but they also raise a preliminary argument that Pegg's lawsuit must be dismissed for failure to internally appeal the International Union's decision to not arbitrate the termination grievance. The Court will address the failure to appeal issue first.

I. *Exhaustion of Internal Appeal Rights*

"While the hybrid action allows an employee to bring suit without having exhausted her remedies under the collective bargaining agreement, the employee generally has a separate remaining duty to exhaust all internal union grievance procedures." *McCall v. Southwest Airlines*

*Co.*, 661 F. Supp. 2d 647, 652 (N.D. Tex. 2009) (citing *Hayes v. Bhd. Of Ry. & Airline Clerks/Allied Servs. Div.*, 727 F.2d 1383, 1385 (5th Cir. 1984)). In fact, the Supreme Court has made clear that "[a]n employee seeking a remedy for an alleged breach of the collective bargaining agreement between his union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement" before maintaining a hybrid § 301/fair representation claim. *Clayton v. Int'l Union, United Auto., & Aerospace, & Agr. Implement Workers of Am.*, 451 U.S. 679, 681, 101 S. Ct. 2088, 68 L. Ed. 2d 538 (1981). But the Supreme Court also recognized that courts have discretion to excuse an employee's failure to exhaust:

> As we stated in *NLRB v. Marine Workers*, courts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.

*Id.* at 689, 101 S. Ct. 2088 (internal citation omitted).

The timeline of events following Pegg's termination leading up to her being advised that the International Union would not arbitrate the termination grievance is critical.

On September 27, 2022, Jeff Andrews, who, again, held the position of Chief Steward for the Local Union, advised M1 via letter of the Local Union's intent to arbitrate Pegg's grievances. Thereafter, Pegg testified that she continually attempted to communicate with Local Union officials to have them update her on the status of her case but received nothing in response:

> Q.    Did you make any efforts to try to communicate with the Union to try to get them to go on and take the matter to arbitration or to have it arbitrated for you?

A.    *Yes, I e-mailed them multiple, multiple times, and they did not respond.*

Q.    E-mailed – who for the Union would you e-mail?

A.    I would e-mail Clyde Jackson and Jeff Andrews.

Q.    And what are their positions?

A.    President and vice president.

Q.    All right. Did any attorney from the Union ever contact you about the case, to discuss the facts of the case with you? Any attorney representing the Union ever contact you before?

A.    No, not before.

Q.    Before you filed the lawsuit.

A.    Not before.

. . .

Q.    Did the lawyers for the Union ever ask you about the facts of the case?

A.    *Nobody, no.*

[131], Ex. 2 at p. 104 (emphasis added).[3]

After retaining counsel, Pegg initiated this lawsuit on May 23, 2023. In her original Complaint [1], which is no longer the operative complaint, she alleged that the Unions acted arbitrarily in failing to take the termination grievance to arbitration. Only two weeks later, on June 6, 2023, the International Union formally advised Pegg, via letter signed by Casey Whitten-Amadon, a staff attorney with the International Union, that it would not arbitrate the grievance related to her termination.[4] That letter specifically advised Pegg of her right to appeal that decision:

---

[3] For context, Clyde Jackson held the position of President of the Local Union.
[4] In his deposition, Whitten-Amadon testified that he was aware of the lawsuit when he issued the June 6, 2023 letter to Pegg. *See* [122], Ex. 10 at p. 4 ("Well, sure. I was very aware of the suit. Of course.").

> Consistent with the CWA Constitution, Article IX, Section 7, and the Arbitration Complaints Procedure established under that power, the grievant has the right to appeal this decision not to arbitrate within thirty (30) days. . . The appeal must: (a) be in writing; (b) signed by the complainant; and (c) specifically state the reasons that the case warrants arbitration.

[96], Ex. 7 at p. 1.

There is no dispute that Pegg did not appeal that decision. In the present filings, the Defendants assert that Pegg's failure to do so is fatal to her claims. But the context is important. At the time she was advised that her claim would not be arbitrated, this lawsuit was pending. The Defendants contend that Pegg should have waited until the International Union advised her of whether or not it would take her case to arbitration before ever initiating this litigation. For instance, the International Union refers to Pegg's filing of this lawsuit as a "rush to initiate federal litigation" while the request to arbitrate "was still pending in [its] legal department." [123] at p. 12. But taking Pegg's version of events as true, Pegg *had* waited and attempted to communicate with the Union officials *for months* without any response before she filed the instant lawsuit. And it was only after this lawsuit was filed that she received a response—in the form of a denial letter.

Applying the overarching standard the Supreme Court articulated in *Clayton*, it appears to this Court that, at a minimum, Pegg "attempt[ed] to exhaust any exclusive grievance and arbitration procedures established by that agreement" before filing this lawsuit. *Clayton*, 451 U.S. at 681, 101 S. Ct. 2088. She followed the appropriate procedure to request her Local Union initiate a grievance on her behalf and, after the Local Union advised M1 of its intent to arbitrate and that decision moved up to the International Union, she allegedly received no responsive communication about her case for several months—from October 2022 through May 2023. It was only after this lawsuit was filed that the International Union advised her that the termination grievance would not be arbitrated. In other words, taking Pegg's version of events as true, the

International Union never communicated with her about her case and only advised her that the case would not be arbitrated *after* she retained counsel and filed this lawsuit.

The Court also feels compelled to address the fact that Pegg had two grievances against M1—one related to the March 2020 demotion and one related to the August 2022 termination. In his September 2022 letter to M1, Andrews advised the company that the Local Union intended to arbitrate *both* grievances. *See* [124], Ex. 12. Although, after Pegg initiated this litigation related to her termination, the International Union advised Pegg, via the June 6, 2023 letter, that it did not intend to pursue arbitration as to her termination grievance, she *still* has not been provided any resolution as to whether the International Union would take the demotion grievance to arbitration. In fact, in his August 2024 deposition, Lance Bergman, who holds the position of Staff Representative for the International Union, testified that to his knowledge, Pegg had not at that time been told that the demotion grievance would not be taken to arbitration.

In short, although the Defendants now contend that Pegg's initiation of this litigation was premature, she still has not gotten a final resolution from the International Union as to the grievance for which she did not initiate federal litigation. The Court finds that fact telling insofar as the initiation of this litigation appears to, at least potentially, have been the catalyst to the International Union taking any action on the grievance pertaining to her termination.[5]

As noted previously, the Supreme Court in *Clayton* made clear that courts maintain discretion in deciding "whether to require exhaustion of internal union procedures." *Clayton*, 451

---

[5] To be clear, Clyde Jackson, in his deposition, testified that there was some resolution to the grievance, specifically testifying that "Ms. Pegg went out -- they demoted her. She went out on a leave. And during that period, the company -- basically, the response we were given is that she would have a position when she got back. And we were told by the staff rep at that time that that would satisfy the grievance." [126], Ex. 7 at p. 3. Despite Jackson's testimony in this regard (which is not definitive), Pegg and Bergman testified differently. Whitten-Amadon testified that he "did not review" the grievance demotion. [131], Ex. 22 at p. 35. The handling of the demotion grievance is far from a model of clarity based on the record before this Court.

U.S. at 689, 101 S. Ct. 2088. One of the considerations relevant to this analysis—specifically listed as the third factor in *Clayton*—is whether mandating exhaustion would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of the claim. *Id*., 101 S. Ct. 2088. The Court finds this factor weighs heavily in favor of Pegg. The International Union's investigation of the termination grievance was allegedly ongoing for several months prior to Pegg initiating this lawsuit, but it was only after she filed this lawsuit that she received any resolution from the International Union.

Requiring Pegg to now pursue the internal remedy of appealing the International Union's decision not to arbitrate would only serve, in this Court's view, to further delay her opportunity to obtain a judicial hearing on the merits of her claim.[6] The Court finds the third factor articulated by the Supreme Court in *Clayton* is satisfied here. The finding alone is sufficient to excuse the exhaustion requirement. *Id*., 101 S. Ct. 2088. ("If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.").

The Court also notes that the steps involved in the internal appeal are unclear based on the record. Although the Defendants refer to Whitten-Amadon's letter advising Pegg of her right to appeal the denial "[c]onsistent with the CWA Constitution, Article IX, Section 7, and the Arbitration Complaint Procedure established under that power," they make no substantive argument pertaining to the appeal procedure and have not even pointed to the actual language of the appeal procedure whatsoever.

---

[6] The Court also notes that the Defendants raise this argument in the posture of motions for summary judgment that they filed approximately 18 months after this lawsuit was initiated. They did *not* file a motion to dismiss on this basis. The parties have engaged in extensive discovery and briefing. Requiring Pegg to revert to an internal appeal procedure at this point, considering all the circumstances in this case, is not warranted.

Considering all of the circumstances of this case, the Court finds it appropriate to exercise its discretion to excuse exhaustion in this case. *See Sandoval v. Brotherhood of Rwy., Airline and Steamship Clerks*, 1986 WL 8893, at *2 (S.D. Tex. July 18, 1986) ("Courts have discretion to decide whether this exhaustion is required."). In reaching this conclusion, the Court is aware that the purpose of the exhaustion requirement is "intended to protect the integrity of the collective-bargaining process and to further that aspect of national labor policy that encourages private rather than judicial resolution of disputes arising over the interpretation and application of collective-bargaining agreements." *Clayton*, 451 U.S. at 687, 101 S. Ct. 2088 (citation omitted). Taking into account the totality of the facts of this case, excusing exhaustion will not undermine that underlying purpose.

The Court rejects the Defendants' request for dismissal on exhaustion grounds.

## II.     Duty of Fair Representation

Having resolved the exhaustion issue, the Court turns to Pegg's contention that the Unions violated the duty of fair representation.

"A union must represent all employees fairly in its enforcement of a collective bargaining agreement. This duty of fair representation stands 'as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.'" *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846, 852 (5th Cir. 1989) (quoting *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967)). But a union maintains "considerable discretion" in processing grievances, and an employee "has no absolute right to have [her] grievance taken to arbitration or to any other level of the grievance process." *Id*. (citations omitted). A union only breaches it duty of fair representation when its "conduct toward a member

of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* (quoting *Vaca*, 386 U.S. at 190, 87 S. Ct. 903).

Additional information about the underlying August 2022 disciplinary action is necessary. As noted previously, Pegg's alleged error, as explained in the corresponding documentation, was failing to identify that a TCTO relating to a seat egress inspection had not been completed when a particular aircraft arrived at Columbus Air Force Base from Vance Air Force Base. Pegg does not dispute that she inspected this particular aircraft. But her explanation for failing to document the incomplete TCTO is simple—it was not her responsibility to do so. In the written statement she completed the day after being notified of M1's allegation against her, Pegg stated, in pertinent part:

> We have no specific guidance that tells us each TCTO must [be] researched to ensure the other base has either completed or not each TCTOs. Nor informed of what type of research would be required to [perform] this task if this is needed.

[96], Ex. 1 at p. 1.

In her deposition, Pegg confirmed that the written statement was accurate. Pegg also contends that any responsibility concerning a seat egress inspection would have fallen to Angela Young, who held the position of egress scheduler. Pegg testified to this point in her deposition:

> The egress scheduler at Columbus Air Force Base, they took the seat records that transferred from Vance. They had to go through and do all of the egress time changes, make sure that they were loaded correctly, populated correctly into our database and then correct all these seat inspections. So apparently the seat inspection wasn't done right whenever it populated. And she, Angela Young, did not translate that information to nobody.

[131], Ex. 2 at p. 81.

Additionally, in his deposition, Andrews testified that his initial investigation yielded a similar conclusion:

14

Q.     And what was your position on whether she had committed a termination offense? What was the position of the union? Let me maybe put it that way.

A.     Well, based on her testimony and the information that I received from Ms. Pegg, based on the events that she described—because you must understand, that I'm an aircraft mechanic and she was working in plans and scheduling, which I've never worked in plans and scheduling. So therefore, I had to rely on speaking with other plans and scheduling people to try to find out if what she was saying was true and accurate.

And based on what she was telling me and based on what her coworkers were telling me, everything that I felt she was telling me was true and accurate. That there was a bunch of things that led up to the grounding of aircraft 8193, but according to her it wasn't her responsibility to have found that discrepancy.

Q.     Were there coworkers that you talked to that corroborated that? You talked to both her and coworkers or was that just her telling you that?

A.     No. I spoke to another coworker as well.

Q.     Do you remember who that was?

A.     I do.

Q.     Who was it?

A.     Marion Baker.

Q.     And, in substance, what did Ms. Baker tell you?

A.     The bottom line, basically she stated that that error could have happened to any one of them based on the processes that were in place at the time.

Q.     In other words, the same error could have been made by any scheduler or other schedulers may have made the same errors?

A.     That was her statement, yes.

15

[126], Ex. 10 at p. 3.

Notably, Andrews also testified that after he later had a conversation with Denise Richardson, who was a Manager of the Scheduling Division, about Pegg's grievance, he "didn't feel as strongly anymore." *Id*. at p. 6. In particular, he testified that Richardson made him aware of a Standard Operating Procedure ("SOP") that caused him to question his initial inclination. Specifically, Andrews stated that Richardson "pointed out that there was an SOP that covered the process for aircraft acceptance inspections and that was what Andrea was doing was acceptance inspection." [131], Ex. 18 at p. 19. He further testified:

> Q.  I see. In other words, you can't tell from that – I couldn't tell from what you read from that SOP as to whose responsibility it was, whether it was Ms. Pegg's or whether it was the person responsible for egress?
>
> A.  Correct. And that's what I relayed to Mr. Cane, and I told him that it's basically above my pay grade, and that the counsel for IUE needs to take a look at it, at least. And I just wanted them to know everything that I knew at that time. If that is incorrect, if what Ms. Richardson was trying to tell me was incorrect, then I felt that Ms. Pegg had a pretty good chance. But if what Ms. Richardson was saying contradicts what Ms. Pegg was saying, then I would -- I felt that the company did have good grounds.
>
> Q.  The interpretation of whatever that SOP meant would have been up to an arbitrator ultimately, wouldn't it?
>
> A.  Yes, sir. In my opinion.

*Id*. at p. 21-22.

For her part, Richardson testified that the error was attributable to Pegg—not Young. She testified as follows:

> Q.  What you're telling me is that it was not -- you're saying it was not Ms. Young's responsibility to review the seat inspection?

A.     Ms. Young did review the seat inspection and it was shown that the 36-month seat is completed. It was not due, but the TCTO that was for that aircraft for that line was supposed to be done when the seat inspection was completed. That seat inspection was completed at Vance. That was never completed, and because the research wasn't done on the TCTO side, that went unnoticed. And what happened is Ms. Pegg put it into a status of awaiting the TCTO awaiting an event, but the event already occurred. So once the event already occurred, you have to do that TCTO, and she should have found that when she did the research because all the documentation pointed to that it was not completed when Vance did that seat inspection.

[131], Ex. 17 at p. 34-35.

As these various pieces of evidence illustrate, Pegg strongly disputes the Defendants' position that the error was attributable to her. And she has come forward with summary judgment type evidence to support that position. It is important to reiterate, though, that a union does not breach its duty to a member by simply not taking a grievance to arbitration. *See Vaca*, 386 U.S. at 191, 87 S. Ct. 903. Instead, a plaintiff must illustrate that the "a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process." *Walker v. Houston Federation of Teachers/Aft Local 2415*, 2016 WL 1275057, at *6 (S.D. Tex. Mar. 31, 2016) (quoting *Landry*, 880 F.2d at 852).

On this point, Pegg attacks the International Union's investigation into the underlying events. In particular, Pegg argues that the International Union, when conducting its investigation, acted in bad faith by relying in significant part on Beard's explanation in light of the well-known animosity that Beard had against her.

Casey Whitten-Amadon, who again held the position of staff attorney for the International Union, testified that he was responsible for the investigation of the grievance related to Pegg's termination. Whitten-Amadon testified that, in conducting his investigation, he began by speaking

with Eric Benjamin, who was a flight line mechanic at Fallon Air Force Base in Nevada at the time. According to Whitten-Amadon, Benjamin told him that the mistake Pegg made was not something that was "normal to miss." 122], Ex. 10 at p. 5. Whitten-Amadon testified that he then reached out to Clyde Jackson and sought Jackson's advice on who he should speak to in Pegg's department to get additional information about the underlying events. Jackson directed him to Beard. Whitten-Amadon spoke to Beard and ultimately reached the conclusion that "[m]y understanding from speaking to Eric Benjamin and Melanie Beard is that the person that reviews the TCTO file should catch that issue." *Id.* at p. 6.

During the deposition, Whitten-Amadon was questioned extensively about his reliance on Beard's explanation, in light of the well-known animosity she had toward Pegg:

> Q. Were you aware that Ms. Beard is the person who took Ms. Pegg's place as lead?
>
> A. I don't believe that Mr. Jackson specifically mentioned that. He did mention that those two did not like each other.
>
> . . .
>
> Q. All right. And Clyde Jackson told you that there was some animosity between Ms. Beard and other employees -- I'm sorry, between Ms. Pegg and other employees, including Ms. Beard, correct?
>
> A. Yes.
>
> Q. But he did not tell you that Ms. Beard replaced Ms. Pegg as the lead in that department?
>
> A. I don't recall that coming up.
>
> Q. And he did not tell you that Ms. Pegg had been repeatedly complaining to the personnel department about the harassment she was receiving from Ms. Beard prior to this time? He didn't tell you about that?

A.  I believe he did tell me that there was a problem with Pegg and all of the other employees in the department.

Q.  But he didn't tell you about the particular problem with Ms. Beard? He didn't tell you she made specific complaints about Ms. Beard?

A.  I don't believe he separated Ms. Beard from the rest of the department as -- yeah. I don't believe he made that distinction.

Q.  Did he tell you that Ms. Beard was angry at Ms. Pegg because she had been out on sick leave for a year and had left her alone to do a lot of work because she was out on sick leave? Did he tell you that?

A.  I don't believe that came up in that conversation.

Q.  And Ms. Beard never volunteered that to you, did she?

A.  She did not.

Q.  She didn't ever tell you about any animosity that she had toward Ms. Pegg; am I correct?

A.  I believe she did say that they didn't have a good relationship, and I followed that up by asking her whether or not she could answer truthfully.

*Id.* at p. 6, 7.

Thus, in reaching his conclusion, Whitten-Amadon relied on the advice of Benjamin, who was located in Nevada, and Beard, who had previously made an allegation against Pegg relating to document theft that was ultimately unsubstantiated and had allegedly made negative comments about Pegg taking medical leave. As Pegg emphasizes, she herself was *not* contacted by Whitten-Amadon. Additionally, other individuals who would have potentially corroborated Pegg's explanation, such as Marion Baker, were not contacted.

Taking into account the disputed evidence as to whether the error was Pegg's responsibility, along with the emphasized shortcomings in the investigation, the Court finds that

19

Pegg has established a question of fact as to whether the Unions acted in bad faith by failing to arbitrate her grievance. In reaching this conclusion, the Court again emphasizes that the demotion grievance has not been resolved, further undermining the credibility of the International Union in the handling of Pegg's claims.

Although the Unions may ultimately convince a jury that it did not act in bad faith, that issue is one for a jury—not this Court at summary judgment—to resolve. *See*, *e.g.*, *Aubrey v. Sch. Bd. of Lafayette Parish*, 92 F.3d 316, 318 (5th Cir. 1996) ("[W]e do not weigh the evidence, assist its probative value, or resolve any factual disputes; we merely search the record for resolution-determinative factual disputes.") (citation omitted). Here, genuine factual disputes abound. The Defendants' request for dismissal on this point is rejected.

### III.    Cause for the Termination

The Court now turns the other element of Pegg's claim—whether M1 violated the CBA in terminating her employment. The CBA itself provides that M1 "may discipline or discharge for just cause." [122], Ex. 1 at p. 45.

Pegg's argument in opposition to summary judgment on this point largely mirrors her arguments set forth previously—that is, that the August 2022 error for which she was ultimately terminated was not her responsibility. In addition to her own testimony, Pegg relies on Andrews' testimony that Pegg's explanation was corroborated by Marion Baker. Pegg further emphasizes that Andrews initially believed Pegg had a strong case and, even after reviewing the SOP that Richardson provided, he was not certain as to whether the error was attributable to Pegg.

In addition, Pegg argues that "this case presents disputed issues of material fact as to whether the claim against Pegg was a vendetta by [Melanie] Beard, rather than Beard's belief that Pegg had committed a work error warranting dismissal." [134] at p. 10. Although Pegg's mere

subjective belief that Beard did not like her would not alone justify denial of summary judgment, there is significant evidence in the record to support that point. For instance, multiple witnesses, including but not limited to Baker and Andrews, testified that there was animosity between them.

For their part, the Defendants argue that the error for which Pegg was terminated was indeed her responsibility, and they emphasize evidence in the form of the testimony of Richardson, Beard, and Whitten-Amadon. They take the position that the termination was based solely on the fact that Pegg was responsible for the August 2022 error and nothing else.

While the Court is cognizant of these arguments, it ultimately finds, for the same reasons referenced in the preceding section, that this is a quintessential jury question. *See, e.g.*, *Evans v. Santos*, 2016 WL 1175209, at *2 (N.D. Miss. Mar. 23, 2016) ("If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine dispute as to a material fact, and summary judgment must be denied.") (citation and internal quotation marks omitted). In short, Pegg has come forward with sufficient evidence to create a genuine issue of material fact as to whether M1 had just cause to support her termination. The Defendants' request for dismissal on this basis is rejected.

### Conclusion

The Defendants' Motions for Summary Judgment [122, 124, 126] are DENIED. Pegg will be permitted to proceed to trial on her claims against them.

SO ORDERED, this the 30th day of September, 2025.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE